Carl ANDREWS, Pedro S. Cordero and
Benjamin Tenzer, Plaintiffs,

v.

Edward I. KOCH, both individually and as Mayor of the City of New York, the City of New York, Carol Bellamy, both individually and as President of the Council of the City of New York, Thomas J. Cuite, both individually and as Majority Leader and Vice Chairman of the Committee on Rules, Privileges, and Elections of the Council of the City of New York, Melvin Markus, both individually and as Chairman of the Redistricting Committee appointed by the Council of the City of New York, and the Board of Elections of the City of New York, Defendants.

No. 81 Civ. 2542 (ERN).

United States District Court,
E. D. New York.

Nov. 17, 1981.

LeBoeuf, Lamb, Leiby & MacRae by Kim Hoyt Sperduto, New York City (Gwenellen P. Janov and Blaine G. LeCense, New York City, of counsel), for plaintiffs.

Allen G. Schwartz, Corp. Counsel of the City of New York by Stephen P. Kramer, New York City (Susan R. Rosenberg and Meryl R. Kaynard, New York City, of counsel), for defendants Koch, City of New York, Bellamy, Markus and Bd. of Elections.

Paul, Weiss, Rifkind, Wharton & Garrison by Edward N. Costikyan, and Jonathan Sinnreich, New York City (Peter Schneider, New York City, of counsel), for defendants New York City Council and Cuite.

Herzfeld & Rubin, P.C. by Herbert Rubin, New York City (Peter J. Kurshan, New York City, of counsel), for intervenors.

Richard Emery, and Arthur Eisenberg, New York City, for New York Civil Liberties Union as amicus curiae.

Paul Wooten, Brooklyn, N. Y., for New York State Black and Puerto Rican Legislative Caucus as amicus curiae.

Cesar A. Perales, and Gabe Kaimowitz, New York City, for Puerto Rican Legal Defense & Education Fund, Inc., as amicus curiae.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Plaintiffs in this action seek partial summary judgment on their first cause of action,[1] which claims that New York City's electoral plan for electing ten of the 45 members[2] of the City Council on an at-large basis violates their constitutional rights under the "one person, one vote" principle derived from the Fourteenth Amendment's equal protection clause. Since there appears to be no genuine dispute among the parties as to the relevant and material facts pertinent to that claim, summary judgment is an appropriate procedure for determining whether the facts entitle plaintiffs "to judgment as a matter of law." Fed.R.Civ.P. 56(c). See *SEC v. Research Automation Corporation*, 585 F.2d 31, 35 (2d Cir. 1978).

Plaintiffs, who include one black citizen and one of Puerto Rican or Hispanic heritage, are registered voters residing in different election districts within the Borough of Brooklyn and County of Kings in the City of New York. They claim the dilution of their voting rights by reason of defendants' actions. The individual defendants named hold the positions of mayor, president of the City Council, majority leader and vice-chairman of the Council's committee on rules, privileges and elections, chairman of the Redistricting Commission appointed by the Council, and members of the City's Board of Elections.[3] They are sued as the officials individually and collectively responsible for the enforcement of the City Council electoral plan of which plaintiffs complain. Defending the existing plan, defendants have cross-moved for summary judgment dismissing plaintiffs' claim for lack of merit.

---

1. Only partial summary judgment is sought because plaintiffs' other causes of action complain of other matters such as, for example, inequities in the delineation of councilmanic election districts, which clearly present issues of fact and are subject to prior scrutiny by the Attorney General of the United States. See *Herron v. Koch*, 523 F.Supp. 167 (E.D.N.Y.1981 [three-judge court]), *cert. denied,* —— U.S. —— ·, 102 S.Ct. 893, 71 L.Ed.2d —— (1981).

2. Under New York City Local Law 47, recently signed by the Mayor, the number of seats on the City Council has been increased from 43 to 45, 35 elected from districts and 10 elected at large from the five boroughs of the City.

3. In addition to defendants, three Liberal Party candidates for the office of councilman at-large, Albert Boyce, William Miller and Henry Stern, were permitted to intervene.

Pursuant to the Charter of the City of New York, §§ 21, 27, the City's legislative power is vested in the City Council. Sections 22 and 23 of the Charter, as amended, provide that the Council shall consist of a President, elected on a City-wide basis, Council members elected from Council districts, now numbering 35, which are subject to redistricting after each federal census to assure precise equality of population, and two Council members-at-large from each of the City's five boroughs. All are elected for four year terms. Plaintiffs' constitutional challenge on this motion is premised solely on the current differences in population of the boroughs the five pairs of at-large members represent, attributable in part to substantial racial minority increases in some of the boroughs.

Before considering the respective parties' contentions, a brief history of the challenged electoral plan is in order. First, it should be noted, these defendants did not originate the plan; they simply carry it out as required by law. The plan was originally adopted by the voters of the City as part of the new New York City Charter at the general election held November 7, 1961, by a vote of 634,152 to 294,338. The plan went into effect as part of the Charter on January 1, 1963, and thus has governed the manner of electing at-large Council members for some 18 years. In 1965 the plan was challenged on the same constitutional grounds advanced by plaintiffs here and survived that challenge. A three-judge district court sitting in the Southern District of New York found that "[t]he disparity in voting strength in the City Council between the boroughs due to the method of election of the Councilmen-at-large is not substantial but minimal." *Blaikie v. Wagner*, 258 F.Supp. 364, 369 (S.D.N.Y.1965). Noting that the at-large method was "designed to afford at least the possibility of representation to a large segment of the population" who could not otherwise elect minority representatives to the Council, the court concluded that there was no violation of the

Fourteenth Amendment under the principle of "rational justification" referred to by the Supreme Court in *Baker v. Carr*, 369 U.S. 186, 235, 82 S.Ct. 691, 719, 7 L.Ed.2d 663 (1961). *Blaikie, supra,* at 370. Defendants strongly urge this Court to adhere to the *Blaikie* ruling as dispositive here.

That there are wide differences in borough population is evident from the following tabulation, the accuracy of which is not disputed:

| Borough[4] | Population |
|------------|-----------|
| Brooklyn | 2,230,936 |
| Queens | 1,891,325 |
| Manhattan | 1,427,533 |
| Bronx | 1,169,115 |
| Staten Island | 352,121 |

Focusing primarily on Brooklyn's population of over six times that of Staten Island, plaintiffs contend that the present at-large councilmanic plan denies voters in the larger boroughs, such as Brooklyn, the full representational weight of their vote, since they elect only the same number of at-large City legislators as lesser populated boroughs. Plaintiffs complain that such inequality results in a debasement or dilution of their voting rights, operates as effectively as would a total denial of the right of suffrage, and has been repeatedly held to violate the equal protection clause of the Fourteenth Amendment in a long line of Supreme Court decisions following the leading case of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

While recognizing the substantial disparities in borough populations, defendants contend that statistical variations alone cannot displace legitimate political goals which non-proportional voting systems may constitutionally seek to advance. They maintain that before an apportionment system may be struck down for violating the statistical guidelines of *Reynolds* and its progeny, a reviewing court must consider whether the statistical deviations

4. These boroughs are respectively co-terminous with the Counties of Kings, Queens, New York, Bronx and Richmond.

are caused by concern for legitimate political goals and whether the resulting legislative body adequately reflects the political interests of the populace. Here, defendants urge, the Council members-at-large device was not the creation of a legislature intent on preserving the power of a minority to control the legislative machinery, but a conscious "one person, one vote" decision by the voters themselves. They point out that two distinct political interests were advanced by the borough-wide election of two Council members per borough. One goal was to ensure minority representation in a local government dominated by a single political party, and the other to do so through political units, the boroughs, having a strong traditional base in New York City government, so as to assure adequate representation of borough-wide interests in replacement for the diminished powers of the Board of Estimate.[5] Emphasizing that the ten at-large seats constitute less than 25% of the Council, defendants argue that one and a half more Council members allotted to Staten Island is not so significant as to require further redistricting.

As plaintiffs and *amici* cogently point out, however, the difficulty with defendants' position is that the Supreme Court has consistently adhered to quite different standards in assessing the conformity of electoral plans to constitutional requirements. First, the Court has instructed "that electoral apportionment must be based on the general principle of population equality and that this principle applies to . . . local elections, *Avery v. Midland County*, 390 U.S. 474, 481 [88 S.Ct. 1114, 1118, 20 L.Ed.2d 45] (1968)." *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971). Second, even though "viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs . . . this [Supreme] Court has never suggested that certain geo-

graphic areas or political interests are entitled to disproportionate representation." *Abate, supra*, at 185, 91 S.Ct. at 1906. To the contrary, the Court has "underscored the danger of apportionment structures that contain a built-in bias tending to favor particular geographic areas or political interests or which necessarily will tend to favor, for example, less populous districts over their more highly populated neighbors . . . ." *Id.* at 185–86, 91 S.Ct. at 1906–1907.

*Abate, supra*, is particularly apposite here as illustrating the Court's consistent adherence to its standard method of determining whether population deviations in election districts are within permissible limits. In that case Rockland County, New York, had devised a plan for an 18-member county legislature to be chosen from five districts which corresponded exactly to the county's five constituent towns. These towns varied widely in population and the number of legislative representatives was determined by assigning one representative to the smallest town and dividing its population into that of each of the other towns to ascertain how many additional representatives each larger town should be granted. The plan was challenged as unconstitutional but upheld by the New York Court of Appeals. In affirming that court's decision, the Supreme Court noted that population variations among the districts produced "a total deviation from population equality of 11.9%," *id.* at 184, 91 S.Ct. at 1906; but the Court was "not prepared to hold that the . . . plan violates the Constitution" in view of Rockland County's long governmental tradition and "the fact that the plan before us does not contain a built-in bias tending to favor particular political interests or geographic areas." *Id.* at 187, 91 S.Ct. at 1907. Of significance here is the Court's concluding remark that:

"[N]othing we say today should be taken to imply that even these factors could

---

5. While it may be true that more power resides in City Hall, judicial notice may be taken that each Borough President still has a vote on the Board of Estimate, the Mayor, Comptroller and

City Council President having two votes each. *Official Directory, The City of New York, 1981 82*, p. 18.

justify substantially greater deviations from population equality." 403 U.S. at 187, 91 S.Ct. at 1907.

■ In *Abate, supra,* each district's legislative representation was in fact roughly proportionate to its population. See 403 U.S. at 184, n.1, 91 S.Ct. at 1906. Here, even on the most conservative basis as shown in the following table, the total deviation from population equality is 50.4% for a City Council of 45 seats:

| | Population | Number of Council-members | Population Per Council-member | % Deviation from the Norm |
|---|---|---|---|---|
| Brooklyn | 2,230,936 | 13.20 [6] | 169,010.3 | −7.56% |
| Queens | 1,891,325 | 11 | 171,938.64 | −9.42% |
| Manhattan | 1,427,533 | 8.92 | 160,037.33 | −1.85% |
| Bronx | 1,169,115 | 8.08 | 144,692.45 | +7.92% |
| Richmond | 352,121 | 3.80 | 92,663.42 | +41.03% |

The total deviation percentage of 50.4% is derived by computing the percent of deviation from the norm of the most underrepresented district with that of the most overrepresented district, here the Boroughs of Queens (-9.4%) and Staten Island (+41.0%).[7] This is the formula devised by the Supreme Court to measure the extent to which population disparities among legislative districts either conform or fail to conform to the constitutional requirement of substantial population equality. See *Abate, supra,* 403 U.S. at 184, 91 S.Ct. at 1906, in which an 11.9% total deviation from population equality was held not violative of the Constitution, and *Whitcomb v. Chavis,* 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971), holding that a total variance of 28.2% between overrepresented and underrepresented districts was constitutionally unacceptable.

In the face of such an extreme deviation between overrepresented and underrepresented boroughs—more than four times the 11.9% guardedly sanctioned in *Abate, supra* —this Court cannot uphold the present method of electing at-large members to the City Council on the reasoning of the *Blaikie* case, as defendants suggest. Although the Supreme Court's decision in *Reynolds v. Sims, supra,* preceded the 1965 ruling in *Blaikie,* there was then no reason to anticipate the Court's later extension of the *Reynolds* rule to purely local elections. We now know from *Reynolds* and the many cases following it that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims, supra,* 377 U.S. at 555, 84 S.Ct. at 1378. And this is likely to result when "population is submerged as the controlling factor in the apportionment of seats in the particular legislative body ...." *Id.* at 581, 84 S.Ct. at 1391.

6. These figures include at-large and district seats. Fractional figures for "Number of Councilmembers" are necessary because the Bronx and Manhattan share two Councilmembers and Brooklyn and Richmond share one. The fractions are computed by the proportion of population as reported in the 1980 census in the portion of the divided district that is within the borough to which the fraction is assigned.

7. The present Council of 43 seats is subject to an even greater deviation from equality, namely, 55.6%.

Plaintiffs take the position that these percentages measure only the "minimum deviation" from population equality. In their view the ten at-large seats represent multimember districts (the five boroughs) distinct from the Council election districts in which the other Council candidates compete for election. Thus, they argue, the percentage deviation from population equality for the at-large seats is actually 132.8%! The Court rejects that argument and percentage, since it is obvious that all Council members, however elected, sit as one body and represent the entire City. The Council cannot be treated as a bicameral legislature as plaintiffs suggest.

The apportionment cases which followed *Reynolds* have consistently confined permissible deviations from equal population to relatively narrow limits, even in those in which some relaxation was permitted. See, *e.g., Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), where Mr. Justice Rehnquist observed that "a State's policy urged in justification of disparity of district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality." *Id.* at 326, 93 S.Ct. at 986. More recently, Mr. Justice Stewart reaffirmed the principle that "a voter's right to 'have an equally effective voice' in the election of representatives is impaired where representation is not apportioned substantially on a population basis." *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 78, 100 S.Ct. 1490, 1506, 64 L.Ed.2d 47 (1980).

On the undisputed facts it is obvious that a voter in the Bronx or Staten Island gets substantially more representation for his or her ballot than a voter in Brooklyn or Queens. The effect is to deprive voters in the latter boroughs of an equal opportunity to participate in the political process. The right to vote is a fundamental right, and it is basic to the value of that right that it be equal among all citizens. The ten at-large Council seats comprise more than 20% of the voting strength of that legislative body, a substantial proportion by any measure. That the plan to treat all boroughs equally in filling those seats was originally adopted by the City's voters, as stressed in the *Blaikie* decision, is immaterial. The Supreme Court has made it clear "that the fact that a challenged legislative apportionment plan was approved by the electorate is without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection Clause . . . ." *Lucas v. Forty-Fourth General Assembly of Colorado,* 377 U.S. 713, 737, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964).

The departure from population equality in allocating at-large seats in the City Council is simply too extreme to be justified on the grounds advanced by defendants. Even while recognizing that "slightly greater percentage deviations may be tolerable for local government apportionment schemes," the Supreme Court has pointed out that it has never suggested "that certain geographic areas or political interests are entitled to disproportionate representation." *Abate, supra,* 403 U.S. at 185, 91 S.Ct. at 1906. Here, the interests defendants urge in support of the status quo appear to be essentially political.

First, the claim that there must be equal at-large representation on the Council "to preserve a 'detente' among the incredibly varied constituent boroughs of the City"[8] is hardly a convincing reason. Granted that the residents of each borough would wish to have their local concerns properly recognized by the City Council, the allocation of at-large seats on a population basis would seem a more effective means of achieving it. And, as already noted, additional channels of communication exist between the boroughs and City Hall through the Borough Presidents, who sit on the Board of Estimate, and the Borough Boards consisting of both at-large and district Council members as well as representatives of local Community Boards.

The other reason defendants and intervenors press upon the Court is clearly political, namely, possible impairment of the role of minor political parties in presenting different or dissenting views in the deliberations of the City Council, which would otherwise be dominated by the majority Democratic Party. Undoubtedly, such representation as minor political parties now have in the Council is attributable to what may be termed the "one candidate, one vote" requirement embodied in the at-large electoral plan, which assures the election of runner-up minor party candidates on an at-large basis. Again, the Court discerns no reason why the allocation of at-large seats on a population basis would destroy minor political parties or prevent the election of

**8.** Memorandum of Law of Defendants New York City Council and Thomas J. Cuite at 41.

their candidates in boroughs other than possibly Staten Island.

Finally, defendants suggest that the present system provides an opportunity for the election of candidates from racial and ethnic minority groups. Indeed, this suggestion is supported by the intervenors, two of whom are black Liberal Party candidates. Though not germane to plaintiffs' claim on this motion, *amici* representing black and Hispanic voters who support plaintiffs' position take a different view. They point out that during the entire history of the at-large system, only one ethnic minority Council member at-large has ever been elected and there are none in that group now. They maintain, moreover, that they are not interested in minority political parties with whom they do not identify, but rather seek recognition and voting rights consistent with their population increase in the several boroughs.

The issue to be decided on plaintiffs' present motion, however, does not implicate questions of political, racial or ethnic discrimination. Simply stated, the question is whether the allocation of an equal number of at-large Council seats to each of the five boroughs, without regard to substantial population disparities, comports with the constitutional rule of substantial numerical equality derived from the Equal Protection Clause of the Fourteenth Amendment. On the undisputed facts, that question must be answered in the negative and the present apportionment of at-large seats in the New York City Council held to be unconstitutional.

Accordingly, there being no just reason for delay, Rule 54(b), plaintiffs are entitled to entry of a separate judgment on their first cause of action declaring that the present equal apportionment of at-large seats in the New York City Council violates the "one person, one vote" principle embodied in the Equal Protection Clause of the Fourteenth Amendment and must be replaced by an electoral plan which accords due recognition to the population differences among the boroughs.

The Court is aware, however, that defendants are currently devising a new apportionment plan for the election of district Council members, so as to meet the objections of the Attorney General under the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1976). No directions will be made at this time to implement the Court's judgment, in the expectation that any revised electoral plan for the City Council will comply with the Constitution as well as the Voting Rights Act of 1965.

SO ORDERED.